**Executors of the ESTATE of Ralph C. WICKER, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 95–811 C.

United States Court of Federal Claims.

March 17, 1999.

George A. Schell, Johnson, Mullan & Brundage, Rochester, New York, for plaintiffs.

Gary L. Hausken, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

HODGES, Judge.

Plaintiff alleges that technology covered by two United States patents issued to Ralph C.

Wicker is being used by the Bureau of Engraving and Printing without a license. The patents provide a method for incorporating anti-counterfeiting procedures into documents. According to plaintiff, defendant is manufacturing and distributing United States paper currency incorporating these anti-counterfeiting features, specifically one hundred dollar denomination bills. Defendant contends that its processes in producing the one hundred dollar note do not incorporate plaintiff's patents, or if they do, the patents are invalid because they are anticipated and obvious in light of prior art.[1]

## BACKGROUND

During the mid–1980's Ralph C. Wicker became aware of advances in copier technology that posed a threat to secured documents. This was the introduction of the color laser copier into the marketplace. As a result of this threat, Wicker began research and experimentation to discover a way to prevent secured documents from being copied on color laser copiers. He discovered such a method in November 1988 and filed a patent application in January 1989. The Patent Office issued patent 5,018,767 ('767 patent) in May 1991.[2] Plaintiff filed an application for a product patent in April 1992, based on the '767 patent. Patent 5,193,853 ('853 patent) was issued by the Patent Office in March 1993.[3]

Prior to the patents' being issued, Wicker contacted the Bureau of Engraving and Printing to offer the technology in the patents to the United States for use in connection with government secured printing. He sent a copy of the patent application to the Bureau and met with representatives of the Bureau and the Secret Service to demonstrate the technology.

The Bureau of Engraving and Printing issued currency in 1990 that contained security features designed to deter counterfeiting. However, recognizing a continuing need to update anti-counterfeiting measures, the Treasury Department contracted with the National Research Council through the National Materials Advisory Board in 1992 for the purpose of analyzing and recommending counterfeit deterrent features that could be incorporated into a redesign of United States Currency.[4] The National Research Council issued a report entitled "Counterfeit Deterrent Features of the Next Generation Currency Design" in 1993. The report detailed evaluations of various technologies available for anti-counterfeiting purposes, as well as research conducted by the Bureau of Engraving and Printing.

The National Research Council recommended that a "moiré technique" be included in the redesign of the currency.[5] Such a technique would deter counterfeiting by color laser copiers and digital scanning systems. The Treasury Department issued the one hundred dollar note in September 1995 and explained its security features, including line patterns that created a moiré when copied.

Wicker analyzed the features contained in the new currency and concluded that they infringed his patents. He filed suit here seeking appropriate damages. We find that the one hundred dollar note issued by the Bureau of Engraving and printing in 1995

1. While there are several plaintiffs in this case, for ease of reference we will refer to plaintiff or to Wicker.

2. '767 is a "process patent." A process patent protects the method of developing an invention. The ultimate product may already be known, but the method of getting to it may be novel.

3. '853 is a "product patent." A product patent is the result obtained; the invention itself.

4. The purpose of the National Materials Advisory Board is the advancement of materials science and engineering in the national interest. The National Research Council was founded in 1916 and is dedicated to the furtherance of science, medicine and meeting national needs. It has members drawn from the councils of the Natural Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine.

5. A moiré, as used in this case, may be described as the interference created when lines on a document interact with the pitch of a copying device. Moiré translates from the French as "watered effect." *Cassell's French Dictionary* 492 (1981). A common example of moiré may be seen in televised pictures of certain plaids or stripes that cause wavy lines or a watery effect on the screen. This distortion caused by the interference with the scanning frequency of the television is a moiré effect.

does infringe the '767 and '853 patents, but that both patents are obvious to one skilled in the art. The patents are invalid.

## I. The '767 Patent

The '767 process patent "relates generally to bogus or counterfeit document detection methods and, particularly to the method for printing or otherwise making a product document that will be nonreplicable by any scanning-type copying device such as a copying machine, video opticon, and the like."[6] Specifically, the claims of the '767 patent that are in dispute are as follows:

2. A method for making an image, of which the replication thereof by electro-optical means having a known scanning pitch is distorted in color or pattern, comprising the steps of:

selecting a suitable matte for creation of said image thereon; and

placing visible and distinct lineations dissonant from the scanning pitch into various patterns of curvilinear lines, dots or swirls on said matte, said lineations having a predetermined distance there between which is termed lineation pitch and which is deliberately chosen to be out of registry with the known pitch, whereby when said image is scanned by an electro-optical scanning device and copied by this device, a moire-skewed copy of the image results because of the nonregistration between the pitches in said image and the device.

3. The method of claim 2 wherein placing comprises printing.

\*\*\*\*

6. A method for making a copy/counterfeit protected document comprising the steps of:

determining the pitch frequency of a known copying machine, by which counterfeit copies of documents are readily attainable, for the purposes of ascertaining a lineation pitch frequency which, when placed as a series of lineations on a document, is out of synchronization with an electro-optical device within the machine having a protocol for scanning a document to be copied, whereby when an out-of-registry event occurs as the document is copied by a copying machine, such an out-of-registry event will repeat with calculable certainty in other line scans during the scanning protocol; and

deliberately placing picture, portrait and design image lineations on a document matte at or near the lineation pitch frequency ascertained in the first step and subtly bending the lineations, during said placing on said matte, to effect azimuthal lineation changes, whereby an attempted copying of said documents bearing said first step-determined lineation pitch and azimuthal parameters, if successful because of registration of said lineations with copy machine protocol, is inaccurate because of inherent inability of an electro-optical scanning device to accurately and precisely detect parts of the lineations of images that fall within the spaces between its scan lines.

7. The method of claim 6 wherein said determining step further comprises choosing a lineation pitch frequency for said placing that is a factor of the frequency of said determining step and will also affect said registration or misregistration.

\*\*\*\*

## II. The '853 Patent

The '853 patent is a product patent that is based on the '767 patent. Claims of the '853 patent that are said to be infringed are as follows:

1. A press-printed document which is counterfeit-resistant with regard to a known electro-optical copy means which copy means has a predetermined scanning pitch, said document comprising; at least one image which is characterized by myriad visible and distinct press-printed lineations, said press-printed lineations comprising patterns of curvilinear lines, dots, or swirls, the lineations having a moire-producing pitch that is dissonant from said predetermined scanning pitch, whereby if said document is copied on said known copy means, the copy of the document so produced reveals image omissions and moire skewing which result from a misre-

---

6. *See* '767 patent, Specification subsection entitled "Field of the Invention."

gistry between said predetermined-scanning pitch and the pitch of the press-printed lineations.

2. The document of claim 1 wherein said lineations are placed in nonuniform directions.

3. The document of claim 1 wherein said lineations have a pitch at, near, or which is an integral factor of said predetermined scanning pitch and therefore are only intermittently registrable therewith.

\*\*\*\*

8. A counterfeit-resistant document press-printed with respect to the known pitch of an optical copying means which provides a copy in which an observer will detect incidents of bogus replication and which comprises:

an image which is characterized in that it is formed by myriad printed lineations comprising patterns of curvilinear lines, dots and swirls, said lineations having a moire-producing pitch which has been purposefully printed so that a plurality of the lineations will misregister with a predeterminable scanning pitch of said copying means so that a copy produced thereby reveals numerous omissions in respect of the document, said omissions being caused by a moire phenomenon.

9. A document which resists counterfeiting by use of an electro-optical scanning means which has a known scanning pitch, deemed a line frequency, comprising:

a substrate adapted to receive thereon indicia formed by a printing operation;

an image comprising myriad printed indicia comprising lineations composed of curvilinear lines, dots or swirls, said lineations printed at a pitch frequency so as to vary minutely with or as an integral factor or the pitch of said scanning means, whereby when said document is copied by use of said scanning means, a product so produced reveals image omissions and distortions which result from a misregistry between said scanning means pitch and the pitch frequency of said printed lineations.

## DISCUSSION

### I. Claim Interpretation

The central issues presented at trial were whether the patents were infringed by the Government, and if so, could the Government demonstrate that the patents were obvious or anticipated. The first step in the analysis is to interpret the claims of the patents. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); see also *Pfund v. United States*, 40 Fed.Cl. 313, 323 (1998). The second step is to compare the properly construed claims to the accused device or process. *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.*, 15 F.3d 1573, 1576 (Fed.Cir.1993).

When interpreting the claim language, the court must look to intrinsic evidence in the record. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996). "To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed.Cir.1991)). Generally, a claim is given its ordinary and customary meaning; that is, the meaning given to it by those skilled in the art. *Vitronics Corp.*, 90 F.3d at 1582.

Two issues require claim interpretation. These issues apply both to the method claims of the '767 patent and the product claims of the '853 patent. The first claim interpretation issue involves determining the level of cognizance required for the use of the scanning pitch of the copying means. That is, does the operator know in advance what the scanning pitch of a given machine must be. The pertinent parts of the patents teach as follows:

**Claim 2 of the '767 patent:** [R]eplication thereof by electro-optical means having *a known scanning pitch*.... [P]lacing visible and distinct lineations dissonant from the scanning pitch ... said lineations having a predetermined distance there between ... which is deliberately chosen to

be out of registry with the *known pitch*....

**Claim 6 of the '767 patent:** A method for making a copy/counterfeit protected document comprising the steps of: *determining the pitch frequency of a known copying machine* ... for the purposes of ascertaining a lineation pitch frequency....

**Claim 7 of the '767 patent:** The method of claim 6 wherein said *determining step* further comprises choosing a lineation pitch frequency for said placing that is a factor of the frequency of said determining step....

**Claim 1 of the '853 patent:** A press-printed document which is counterfeit-resistant with regard to a *known electro-optical copy means* which copy means has a *predetermined scanning pitch* ... [with] lineations having a moire-producing pitch that is dissonant from said *predetermined scanning pitch*....

**Claim 3 of the '853 patent:** The document of claim 1 wherein said lineations have a pitch at, near, or which is an integral factor of said *predetermined scanning pitch*....

**Claim 8 of the '853 patent:** A counterfeit-resistant document press-printed with respect to the *known pitch of an optical copying means* ... [with] lineations ... purposefully printed so that a plurality of the lineations will misregister with a *predeterminable scanning pitch*....

**Claim 9 of the '853 patent:** A document which resists counterfeiting by use of an electro-optical scanning means which has a *known scanning pitch*....

'767 and '853 patents (emphasis added).

Defendant argues that the claims require that the document designer actually determine the scanning pitch of the copier before proceeding with the design of the document. Mr. Leonard Buckley is the assistant foreman in the Engraving Division at the Bureau of Engraving and Printing, and the designer of the one hundred dollar note. He testified that he did not determine the scanning pitch

of the color laser copier prior to observing moirés being created.

Plaintiff acknowledges that the first step in designing a document in accordance with the patents is to determine the scanning pitch of the copier. Once this is accomplished, the document is designed and printed with lines, dots, and swirls that are placed intentionally to misregister with the scanning pitch of the replicating machine. This causes a moiré. Plaintiff alleges however, that the document designer may use any number of methods to determine the scanning pitch of the machine. Methods for determining the scanning pitch include using a screen pattern indicator,[7] conducting empirical testing, and inquiring of the manufacturer.

The disputed claims in the '767 patent teach that the scanning pitch of the copier must be determined prior to designing the document. Claim 2 of the '767 patent states that the lineation pitch is said to be "deliberately chosen to be out of registry with the known pitch." Thus, to place the lineations on the document, the designer must first have knowledge of the scanning pitch of the copy device. Claim 6 of the '767 patent supports this interpretation. A document designer must "determin[e] the pitch frequency of a known copying machine ... [to] ascertain[ ] a lineation pitch frequency...." Claims 6 and 7 of the '767 patent refer to this first step of ascertaining the pitch frequency of the copying device as the "determining step." These claims require that the pitch of the copier be ascertained in order to design a document that will interfere with the pitch of the copier, thus causing distortions or omissions on the document when copied.

Claims 1, 3, and 8 of the '853 patent refer to a copy means that have a "predetermined scanning pitch." Claim 9 refers to this predetermined pitch, but instead uses the term "known scanning pitch." The context of the patents reveals that the terms "predetermined" and "known" are used synonymously. Claim 8 is the most telling, because it states that lineations are purposely printed to misregister with a predeterminable scanning

7. A screen pattern indicator is a lined ruling device. The lined ruling is placed on top of a document, then copied. The indicator will tell a

document designer where the greatest area of moiré is, and that would indicate the lines per inch of that particular device.

pitch. The language in each claim implicates the same determining step found in the '767 patent. That being said, we find that the '853 patent claims also require knowledge of the scanning pitch of the copier prior to document design.

■ Extrinsic evidence cannot be used to vary or contradict the terms of the patent claims, but it can familiarize the court with the "terminology of the art to which the patent is addressed." *Markman,* 52 F.3d at 986. Dictionaries are considered to be extrinsic evidence, and a court may consult them to interpret claims in a patent in a manner consistent with the specification. *Vitronics Corp.,* 90 F.3d at 1584 n. 6. Predetermine means "to . . . decide, or decree beforehand." *Webster's New World Dictionary,* 1061 (1988). The language of the claim require that the scanning pitch of the copier be determined beforehand.

The patent specifications lead to the same conclusions. "Claims must be read in view of the specification, of which they are a part." *Markman,* 52 F.3d at 979. "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." *Id.* The language regarding determination of a scanning pitch can be found in the specifications of both patents. The pertinent part reads:

> [I]n its method aspect this invention comprises the step of producing an electro-optically nonreplicable original certificate by providing on a matte a lineate pattern of visible image-defining lines which are of predetermined moire-producing pitch relative to an electro-optic copy machine scan protocol. . . . [T]his method includes the preliminary step of determining the pitch of an electro-optic copy machine scanner.

The parties do not dispute that knowledge of the scanning pitch of a copier can be obtained in several ways. As described earlier, a screen pattern indicator will inform the designer where areas of moiré will occur, and indicate the lines per inch of the copying device. The empirical method essentially is a process of trial and error. A designer would take an existing document or create a document using several different lined rulings and make color copies of it to determine what lined ruling would create the greatest moiré. That would signify the ideal line structure in a document to create a moiré on that particular type of device. A third approach is to inquire of the manufacturer the pitch of the scanner.

The claims in the '767 and the '853 patents do not limit the method by which a document designer may determine the pitch of a copying machine. The claims require only that the pitch of the copying device be determined prior to placing the lineations on the document.

■ The second claim interpretation issue involves determining the meaning of the term "misregister" or "out-of-registry." The pertinent portions of the '767 and '853 claims teach as follows:

> **Claim 2 of the '767 patent:** [L]ineations having a predetermined distance . . . which is *deliberately chosen to be out of registry* with the known pitch. . . . [A] moire-skewed copy of the image results because of the *nonregistration between the pitches* in said image and the device.

> **Claim 6 of the '767 patent:** [D]etermining the pitch frequency . . . for the purposes of ascertaining a lineation pitch frequency which, when placed as a series of lineations on a document, is *out of synchronization with an electro-optical device* . . . an out-of-registry event occurs. . . .

> **Claim 7 of '767 patent:** [C]hoosing a lineation pitch frequency for said placing that is a factor of the frequency of said determining step and will also affect said *registration or misregistration.*

> **Claim 1 of '853 patent:** [I]f said document is copied . . . the copy of the document . . . reveals image omissions and moire skewing which result from a *misregistry* between said predetermined-scanning pitch and the pitch of the press-printed lineations.

> **Claim 3 of the '853 patent:** [L]ineations have a pitch at, near, or which is an integral factor of said predetermined scanning pitch and therefore are *only intermittently registrable* therewith.

**Claim 8 of the '853 patent:** [L]ineations will *misregister* with a predeterminable scanning pitch....

**Claim 9 of the '853 patent:** [L]ineations printed at a pitch frequency so as to vary minutely with or as an integral factor or the pitch of said scanning means, whereby ... omissions and distortions ... result from a *misregistry* between said scanning means pitch and the pitch frequency of said printed lineations.

'767 and '853 patents (emphasis added).

Defendant reads the claims to require that the "printed lines have different spacing than the scan lines such that some portion of the printed lines fall within gaps in the scanning mechanism where the information cannot be seen." According to the Government, plaintiff cannot show that any line pattern on the 1996 Series one hundred dollar note has a spacing which differs from the scanning pitch of the Canon Color Laser Copier 500. Therefore plaintiff cannot prove infringement.

Plaintiff asserts that the terms "registry" and "misregistration" do not refer to a difference between the pitch of the printed lines on the documents and the pitch of the scanner, but to the failure of a scanner to "read" portions of the printed matter. Plaintiff claims that misregistration occurs when the line spacing at 100 lines per inch does not perfectly line up with the elements of the charge coupling device of the color laser copier.[8] This results in a misregistration that causes distortion in copies.

Claims 2, 6, and 7 of the '767 patent use the terms "nonregistration," "out-of-registry," "misregistration," and "out of synchronization." The terms are not defined in the claims, the specification, or the prosecution history.

Those terms are not defined in the '853 patent claims either. Claim 3 of the '853 patent, which is a dependent claim on claim 1, states that "lineations have a pitch at, near, or which is an integral factor of said predetermined scanning pitch and ... are only intermittently registrable therewith...." This claim is unambiguous. It

does not require that the pitch of the printed lines on the document differ from the pitch of the copy device as defendant contends. The lineations may have a pitch "at" the predetermined scanning pitch. Claim 1 of the '853 patent describes image omissions and moiré skewing resulting from a misregistry between the pitch of the scanner and the pitch of the lineations. A reading of the term "misregistry" to limit the claims to differing pitches would contradict claim 3, which allows lineation pitches and copy device pitches to be identical. Claim 9 in the '853 patent supports this interpretation. Lineations with a pitch frequency may "vary minutely with or as an integral factor or the pitch of said scanning means ...." (emphasis added).

The claims in both patents use the term "misregistry." Claim 6 of the '767 patent states that lineations on a document will be "at or near the lineation pitch frequency ascertained in the first step...." The first step refers to determining the pitch of the copying device. For a document to be free of omissions and moiré-skewing, it must "register." That is to say, the copy mechanism must read portions of the printed matter. The claims teach that the respective pitches of the copy machine and lines on a document may differ, but they may also be identical.

## II.  Infringement

■■■ After construing the claims in the patent, the court must compare the properly construed claims to the accused devices. *Markman,* 52 F.3d at 976. Infringement is a question of fact. *Markman,* 517 U.S. at 384, 116 S.Ct. 1384. To find literal infringement, the accused device or method must contain every element called for in the claim. *Lantech, Inc. v. Keip Mach. Co.,* 32 F.3d 542, 546 (Fed.Cir.1994) (citing *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1577 (Fed.Cir.1989)).

### A.

■■■ Defendant contends that the scanning pitch of the CLC 500 copier was not determined by Mr. Buckley of the Bureau of Engraving and Printing prior to his decision to incorporate concentric fine lines into the

8.  The charge coupling device is the recording part of the scanner.

one hundred dollar note. Thus, there was no infringement of the '767 or '853 patents according to the Government. We disagree.

The claims of the '767 and '853 patents require determination of the scanning pitch prior to document design. We have not read the claims to limit the method in which a scanning pitch is determined however. Mr. Buckley used an empirical method to determine the pitch of the Canon CLC 500. At trial Mr. Buckley testified that he used the Canadian $50 dollar bill as supporting material for selecting 100 lines per inch for the concentric fine line printing. He placed the fifty dollar Canadian note on the CLC 500 and made a copy of it. There was inaccuracy and distortion in the copy. Mr. Buckley then asked another engraver from the Bureau of Engraving and Printing to count the lines on the note. That person determined that the note had 100 lines per inch. The purpose of testing the foreign notes and selecting line patterns was to create a moiré effect upon copying, according to Mr. Buckley.

The line spacing in the 1996 one hundred dollar note that produces a moiré when copied is 100 lines per inch. Mr. Buckley had actual knowledge that lines spaced at 100 lines per inch would cause distortions and omissions when copied on a CLC 500. This knowledge was obtained from testing the Canadian $50 dollar note. Mr. Buckley's design decisions in the 1996 one hundred dollar note were based on his knowledge that 100 lines per inch would cause distortions when copied on a CLC 500. He knew that the pitch of the CLC 500 would interact with the lines on the document to cause omissions and moirés. Mr. Buckley was knowledgeable concerning copying devices, and the one hundred dollar note was designed with this knowledge in mind.

The point of determining the scanning pitch first is that a document designer may create a document with specific line rulings knowing that they will create a moiré when copied. That is what has happened here. Mr. Buckley, through the empirical testing method determined the scanning pitch and lineation spacing that when copied, would cause a moiré pattern when copied. Mr. Buckley admitted during trial that he made tests of the reverse side of the one hundred dollar note before the final design was accepted with respect to the concentric fine line printing. Defendant asserted during cross of Professor Noga that Mr. Buckley could have arrived at the scanning pitch not necessarily by knowing the scanning frequency, but by knowing that it worked. That argument makes the point. The patents do not teach the method for determining the scanning pitch.

Moreover, plaintiff's expert testified that making a copy of the reverse side of the Canadian fifty dollar bill on a CLC 500 would give a designer the pitch of the copier if the line patterns contained on a document was consistent with the scanning pitch of the copier being utilized. Professor Noga examined other color laser copiers and determined that the pitch of those machines was also 100 lines per inch. The Bureau of Engraving and Printing was in the process of learning new counterfeit deterrent features so that these features could be incorporated in United States currency. It wanted a document that could not be accurately copied on any type of copying machine, not just a CLC 500. The primary concern of the BEP at this time was the threat of color copiers, however.

It is necessary for a document designer to know the scanning pitch of the copying device to create a document that produces a moiré in a specific place on the document. The BEP knew that the scanning pitch of all color copiers was the same. It is widely known in the industry that the scanning function cannot be altered on a color laser copier. As Professor Noga testified, "it's already been fixed by the manufacturer." As a result, BEP knew that by determining the pitch of a CLC 500, a document could be designed to create moirés in a specific location on the document.

### B.

Next, plaintiff claims that the 1996–series one hundred dollar note infringes the patents because the note contains color shifting, omissions, and skewed lines caused by misregistration of the scanning pitch and printed lineations. Defendant alleges that the accused note does not "misregister" because

the claims require that the printed lines have different spacing than the scan lines on the copier. We determined that the claims do not teach that the scanning pitch of the copier and the pitch of the printed lines must have different spacing. Rather, the printed lines may have a pitch at, or near the lineation pitch.

The accused line patterns of the one hundred dollar note were spaced identically at 100 lines per inch to cause distortions. Mr. Buckley testified at trial that the background pattern behind the portrait of Benjamin Franklin on the one hundred dollar note was spaced at 100 lines per inch. The line spacing was chosen to be "hard to duplicate." The line spacing for the numeral 100 in the upper right-hand side of the front of the one hundred dollar note was set at the same frequency as the oval behind the portrait of Benjamin Franklin—100 lines per inch. The same is true for the design of the oval surrounding Independence Hall on the reverse side of the one hundred dollar note. The designs were chosen to create a moiré or omission when duplicated. The lines on the one hundred dollar note were "at, near, or . . . an integral factor of said predetermined scanning pitch. . . ." As a result, the lines on the one hundred dollar note misregister with the scan lines of the CLC 500.

Professor Noga testified that the line structures used in the one hundred dollar note match the pitch of a color laser copier. Defendant argues that plaintiff has not proven that any distortions in photocopies of the 1996 Series note resulted from the copier not seeing portions of the printed lines that fall within gaps between the scanning lines. Defendant's argument is inconsistent with our interpretation of the patents. The lineations on the 1996 one hundred dollar note misregister with the scanning pitch of the copier.

The '767 and '853 patents were infringed by the United States. The Court of Appeals for the Federal Circuit has directed that trial courts decide both the issues of infringement and validity. *See Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1576 (Fed.Cir.1984). We turn now to the issue of validity.

### III.  Validity

■■■■ A patent is presumed valid. 35 U.S.C. § 282 (1994). This presumption places the burden of persuasion on the party asserting invalidity. *Checkpoint Systems, Inc. v. United States Int'l Trade Comm'n,* 54 F.3d 756, 761 (Fed.Cir.1995). Patent invalidity must be proved by clear and convincing evidence. *Massey v. Del Labs., Inc.,* 118 F.3d 1568 (Fed.Cir.1997). Defendant has proffered two separate validity arguments—anticipation and obviousness. Anticipation of a patent is "established only when a single prior art reference discloses, expressly or under principles of inherency, each and every element of a claimed invention." *RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440, 1444 (Fed.Cir.1984). A patent is invalid if the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

### A.  Obviousness

■■■■ Obviousness is a question of law. *Para–Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.,* 73 F.3d 1085, 1088 (Fed.Cir.1995). The Government must prove the factual predicate by clear and convincing evidence. *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 767 (Fed.Cir.1988), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989). The factual determinations include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations, if any, of nonobviousness. *See Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

■■■■ The secondary considerations of nonobviousness include: "commercial success, long felt but unsolved needs, failures of others, and copying." *Para–Ordnance Manufacturing, Inc. v. SGS Importers International, Inc.,* 73 F.3d 1085, 1088 (Fed.Cir. 1995) (citing *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). "What the prior art teaches and

whether it teaches toward or away from the claimed invention also is a determination of fact." *Para–Ordnance Manufacturing, Inc.,* 73 F.3d at 1088.

■■■ Defendant contends that plaintiff's patents are obvious.[9] It refers specifically to British Patent No. 1,138,011, Bank of England Series D banknotes, Bank of Canada 1986 series banknotes (specifically the $2 and $5 notes), and German Patent No. 36 20 563 C1.[10] The critical date for determining obviousness is the date the invention was made. 28 U.S.C. § 103. For the Wicker patent this is November 25, 1988. This is the date that Mr. Wicker contends he conceived the technology. The prior art listed above was available to the public prior to November 1988.

■■■ Plaintiff's purpose in developing his patents was to provide anti-counterfeiting features for secured documents. The anti-counterfeiting feature contained in the Wicker patents is the use of moirés. Moiré patterns have been used for anti-counterfeiting purposes since at least 1969 in the teachings of British Patent No. 1,138,011. The mathematical formulas for determining moirés were described in articles published in the early 1960's. IBM proposed to perform a study of moiré-inducing patterns for the Federal Reserve in 1980. The use of moiré patterns is not a unique concept. They have been known about and used for anti-counterfeiting purposes for years.

Thus, the question becomes what is the novel concept illustrated through the Wicker patents. We begin the obviousness analysis by considering the similarities between the Wicker patents and the four prior art works enumerated by defendant.

### 1.

### Scope and Content of the Prior Art

British Patent No. 1,138,011 concerns improvements in printed matter for the purpose of rendering counterfeiting more difficult. It prevents successful counterfeiting by the half-tone screening reproduction process by virtue of the intersection of patterns and configurations on the printed document with the rectangular screen grid pattern of the half-tone reproduction screen.[11] The British patent requires at claim 3 that:

> Printed matter ... [is] such that reproducing the printed matter by means of a colour-separation method using a half-tone screen comprising a rectangular grid pattern having uniform line spacings in the range 75 to 500 lines per inch, creates a perceptible Moiré pattern on the printed reproduction.

The specifications of the British patent state that "[One] cannot assume that the half-tone screen used by the counterfeiter will have any given line spacing nor can it assume that any given screen orientation will be used. According to the invention the original document is provided with one or more patterns selected so that, when light therefrom is intercepted by a rectangular half-tone screen, then regardless of the orientation of the screen selected by the counterfeiter a perceptible Moiré pattern will necessarily, or at least will with a high degree of probability, be created."

The British patent teaches a document designer to include a range of line spacings throughout the document. This is done so that the document designer does not need to determine the pitch of the copying device. The document includes a range of line spacings to intercept with the pitch of the chosen copying device. The designer knows that so long as the pitch of the copying device is within the range of 75 to 500 lines per inch, then somewhere on the document a moiré will be created.

9. In the obviousness discussion, no distinction between the method claims of the '767 patent and the article claims of the '853 patent is necessary. The same art renders both sets of claims obvious.

10. It is worth noting that none of the prior art references listed were considered by the examiner during the prosecution of the '767 patent. Both the British and German patents were pre-sented to the examiner late in the prosecution of the '853 patent.

11. At the time, the screens were the predominant method for copying photographs and color documents. A secure document designer must first *identify the screens* to be used and then create line patterns that have a frequency that will generate moiré patterns.

Claim 2 of the Wicker '767 patent requires that the scanning pitch of the copying device be known. The lineations are deliberately placed on the document so as to misregister with the known pitch of the scanning means. "Known scanning pitch" requires a document designer to ascertain the pitch frequency of the copying device prior to designing the document. This has been referred to previously as the "determining step." Thus, the Wicker patents teach the designer to design the documents with a specific scanning pitch in mind.

It would have been obvious to one of ordinary skill in the art that by determining the scanning pitch of a copying device, a document could be designed to create a moiré when copied on that device. Put another way, one of ordinary skill in the art would conclude that the exact location of a moiré could be determined where the pitch of the copying device cannot be altered. The British patent therefore teaches toward the Wicker patents.

German Patent DE 3,602,563 C1 provides security measures by implementing moiré-generating optically effective structures. The patent teaches the security document designer that line structures are specifically designed to interact with a "raster." [12] The interference created is known as a "moiré phenomenon." The patent focuses on safeguarding documents where the frequency of the raster may be altered. It teaches that line patterns should have varying frequency. It claims an improvement in the design of moiré-inducing patterns by regular repeating patterns of line structures that are visible regardless of the position of the raster.

While the German patent does not require the scanning pitch or frequency of the copying device to be determined beforehand, it teaches that regardless of the scanning frequency a moiré can be created by composing varying degrees of line structures in a docu-ment. The important distinction between the prior art and the Wicker patents is that prior to the Wicker patents, document designers had to design documents to create a moiré where the frequency of the scanner could be altered during the copying process or varied widely in the industry. All plaintiff's patent did was to determine the scanning frequency, then design a document around that frequency to cause moiré phenomena. Plaintiff was able to do this because as technology in the field of copying devices improved, the pitch of the certain copying devices were set by the manufacturer. Once the frequency of the copying device was set by the manufacturer, it could not be altered or changed by the operator.[13] Thus, a document could be designed in such away as to pinpoint where the moiré would occur.

We disagree. The creation of a moiré for anti-counterfeiting purposes had been known for years prior to Wicker's patents. Prior art, specifically the British and German patents teach toward the Wicker patents. The purpose of the prior art was to design a document that would create a moiré when the scanning frequency of the copying device was unknown. It was obvious to those skilled in the art that designing a document and incorporating anti-counterfeiting features into that document would be much simpler if the scanning pitch could be determined first. The British patent gets around this problem by placing varying degrees of line frequencies on a document so that a moiré would be created no matter what the scanning frequency.

The Bank of England Series D notes teach that moiré fringes are seen when various line patterns were contact printed using 120, 133 and 150 lined screens. Mr. Lee, a security printing consultant formerly with the Bank of England Printing Works, testified that he determined that blocks of colored line patterns having rulings of 67.5 lines per inch, set at six equally spaced angles between zero

---

12. A "raster" is a screen. In the specifications of the German patent, a raster unit includes such devices as "a scanner or a process camera."

13. We do not interpret the claims of the '767 and '853 patents as being limited in scope to color laser copiers. The Wicker patents require that the pitch of the copying device be deter-mined before design, however. This leads to the conclusion that if the pitch of the device could be altered, the anti-counterfeiting features may be ineffective. Color laser copiers such as the CLC 500 have a pitch set by the manufacturer so they may not be altered.

and ninety degrees would induce moiré patterns with the largest variety of screen frequencies and thus insured that a moiré would result if a secured document was copied using photo-mechanical separation.[14] By the 1970's the Bank of England Printing Works recognized the threat of counterfeiting imposed by electronic scanners. The moiré-inducing line patterns designed for use against the photo-mechanical screens were also effective against the electronic scanner. The results of Mr. Lee's research were incorporated into the Bank of England Series D banknotes.

The topic of moiré-inducing patterns for security purposes was discussed at the Banknote Printers Conference in Helsinki in 1982 and at the International Masters Printers Association, Intergraph High Security Conference in Italy in 1983. Mr. Lee lectured on the topic and provided information to the United States for use with their secured printing. He noted that moiré-inducing patterns were effective against electronic scanners, as well as color copiers. Copies of the Series D notes admitted at trial showed moiré patterns and omissions of design or color when copied on a color copier. The one pound notes were introduced in 1975 and the ten pound notes in 1978. They remained in circulation for more than 10 years. It is reasonable to infer that the notes entered the United States prior to 1987 and thus were available prior to the critical date. They teach that moiré patterns can be found in a secured document when copied on scanners or color copiers. Wicker's patents added nothing new to the art.

Similarly, the Bank of Canada 1986 Series Banknotes were designed to induce a moiré when copied with scanners using any of the screen rulings common in the industry at that time. Mr. Lowther from the Thomas De La Rue Company designed the notes in response to the threat posed by electronic scanners. Both the two dollar and five dollar notes were available in the United States prior to 1988. The notes containing the Canada sky pattern[15] will induce moirés when copied on a color laser copier.

The prior art works taken together demonstrate that the '767 and '853 patents were obvious. They teach a designer to include certain line spacings and angles on a document to interfere with the frequency of the copying device. They show that a moiré could be visible on a document copied on scanners or color copiers prior to Wicker's patents. Wicker's patents were obvious to one skilled in the art.

2.

Level of Ordinary Skill in the Art.

The art to which the Wicker invention applies is security document design. A security document designer tries to produce an aesthetic design for documents that incorporates features that prevent the accurate copying or alteration of the document. Designers are charged with knowing the possible threats to documents and they incorporate these anti-counterfeiting features into the documents. Expert testimony at trial established that one of ordinary skill in the art would have some form of background in anti-counterfeiting measures. A novice security designer generally serves in an apprenticeship for approximately seven years. Thus, the designer of ordinary skill would at minimum have seven years of experience. Those working in the security design field would attend professional conferences and learn based on observations of others working in the field. Designers should also possess an understanding of the printing processes used in the production of security documents. Testimony at trial established that Mr. Buckley from the Bureau of Engraving and Printing was skilled in the art.

3.

Secondary Considerations

Secondary considerations "sometimes can be the most probative objective evidence in determining whether the patented invention

---

14. Contact screens were commonly available in rulings ranging from 45 to 300 lines per inch.

15. The Canada sky pattern consists of the word "CANADA" in block letters and a "sky" area surrounding the letters. The letters in "CANADA" are composed of parallel lines with the lines per inch varying from 130 to 100. The "sky" consists of concentric arcs or circles.

was obvious at the time to one of ordinary skill in the art." *Pfund,* 40 Fed.Cl. at 356 (citing *Heidelberger Druckmaschinen AG v. Hantscho Commercial Products, Inc.,* 21 F.3d 1068, 1072 (Fed.Cir.1994)). Plaintiff contends that the '767 and '853 patents have found commercial success in the market. More specifically, plaintiff had at the time of trial executed 83 original license agreements with secured document printers for the technology of the '767 and '853 patents. While plaintiff's patents are commercially successful, this does not persuade us that the claimed inventions were nonobvious in light of facts established at trial.

Plaintiff claims that a study conducted by the Treasury Department was the result of a need to find new counterfeit deterrent measures. He argues that this shows the invention filled a long felt but unsolved need in the art. With new technology in the marketplace, there is always a need for improved counterfeit-deterrent measures in secured documents. Plaintiff filed the '767 patent application less than two years after the first color copier entered the market. Thus, color copiers were available for a comparatively short period of time. There is no evidence to suggest that long-term unsuccessful efforts were made to create a moiré on a copy of a secured document using a color laser copier. The secondary considerations that plaintiff relies upon do not suggest nonobviousness.

In evaluating obviousness, "it is crucial for the court to avoid hindsight and view the invention and the prior art from the perspective of one of ordinary skill in the art at the time of the invention." *Pfund,* 40 Fed.Cl at 351. Moreover, "[t]he consistent criterion for determination of obviousness is whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in light of the prior art." *In re Dow Chem. Co.,* 837 F.2d 469, 473 (Fed.Cir.1988).

### B. Anticipation

We established at trial that the Wicker patents are obvious in light of prior art. Because we find the patents obvious, it is unnecessary to address the anticipation defense.

## CONCLUSION

The claims of the '767 and '853 patents cover the accused device, but the claims are invalid by reason of obviousness pursuant to 35 U.S.C. § 103. Plaintiff is not entitled to compensation under Section 1498(a). The Clerk will dismiss plaintiff's complaint. No costs.